UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL HOLLAND, Individually and on behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DRAFTKINGS, INC., and FANDUEL, INC.,<br><br>Defendants. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Daniel Holland ("Plaintiff"), individually and on behalf of all others similarly situated, files this class action against defendants DraftKings, Inc. ("DraftKings") and FanDuel, Inc. ("FanDuel") (collectively, "Defendants"). Plaintiff states and alleges as follows upon information and belief, based upon, *inter alia*, investigations conducted by and through his attorneys, except as to those allegations pertaining to Plaintiff personally, which are alleged upon knowledge. Plaintiff invokes this Court's jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d).

## SUMMARY OF THE ACTION

1.      Plaintiff brings this class action individually and on behalf of a class of persons who play "daily fantasy sports" through websites operated by Defendants. Defendants engaged in various unfair business practices that resulted in harm to both Massachusetts consumers and consumers nationwide.

2.      For instance, Defendants market themselves offering "more winnings" and paying out more than a billion dollars to consumers. Yet, they fail to disclose that the insiders at their

companies have unjustly reaped the earnings from the online competitions by using Class (as defined herein) members' collected information to the insiders' advantage.  This conduct—akin to insider trading—allows employees to use statistics to gain a competitive advantage over the average consumer.

3.      This conduct was recently revealed when it was reported that a DraftKings employee **admitted** he had prematurely released sensitive data about the site's biggest contest. The same week, he won $350,000 on FanDuel, something both companies acknowledge.

4.      The Defendants also misled consumers by promising "bonuses" that supposedly would match Class members' deposits into their account, such as:





5.      The Defendants, however, did not pay bonuses as advertised. Instead, the so-called bonuses came with additional conditions before any consumer could access the deposited bonuses.  For example, FanDuel releases the money at a 4% rate of the entry fee for every contest a consumer enters.  That means to get the "free" $200, a consumer would have to put $5,000 in play on FanDuel.[1]  DraftKings, in turn, does not give you immediate access to any awarded "bonus."  Instead, it releases the deposited bonus in increments—$1 for every 100 Frequent Player Points earned—so, if a consumer was given a $200 bonus, the consumer would need to accrue 20,000 Frequent Player Points to access the bonus.[2]

6.      Defendants' conduct violates numerous state laws, including Massachusetts, which protects consumers from deceptive acts and practices.  Defendants' unfair, deceptive, and misleading course of conduct has caused damages to Plaintiff and the Class.  Further, the U.S. Department of Justice and Federal Bureau of Investigation are currently investigating the Defendants.[3]

7.      Defendants' material misrepresentations and omissions fraudulently induced Plaintiff and the proposed Class to give Defendants money, which ultimately went to Defendants and their employees through fees and contest prizes.

---

[1] Hook, *The Truth About FanDuel's "Up to $200 Free on Your First Deposit" Welcome Bonus*, Total Sports Blog (Oct. 3, 2014), http://www.totalsportsblog.com/2014/10/truth-fanduels-200-free-first-deposit-welcome-bonus/.

[2] Jason Spry, *How to Earn out the DraftKings Bonus*, Daily Fantasy Sports 101 (Updated Oct. 14, 2015), http://www.dailyfantasysports101.com/earn-draftkings-bonus/.

[3] Brad Reagan and Devlin Barrett, *FBI, Justice Department Investigating Daily Fantasy Sports Business Model*, Wall St. J. (Updated Oct. 15, 2015 7:46 p.m., ET) http://www.wsj.com/articles/fbi-justice-department-investigating-daily-fantasy-sports-business-model-1444865627.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action under 28 U.S.C. §1332(d), because this is a class action in which: (i) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (ii) members of the proposed Class are citizens of a State different from Defendants; and (iii) the number of Class members is greater than 100.

9.     Because a substantial portion of the wrongdoing alleged herein occurred in Massachusetts, the Court has personal jurisdiction over Defendants.  Defendants also have sufficient minimum contacts with Massachusetts and have otherwise intentionally availed themselves of the markets in Massachusetts through the promotion, marketing, and sale of products sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under 28 U.S.C. §1391(b)(2) and (3) because: (i) a substantial part of the events or omissions giving rise to these claims occurred in this District; (ii) a substantial part of the property that is the subject of this action is situated in this District; and (iii) Defendants are subject to the Court's personal jurisdiction with respect to this action.

## THE PARTIES

11.     Plaintiff is a citizen of Massachusetts.  Plaintiff has played daily fantasy sports through the DraftKings' website.

12.     Defendant DraftKings is a Delaware corporation with its principal place of business in Boston, Massachusetts.  DraftKings describes itself as a "leading provider of daily fantasy sports" and reported $30 million in revenues in 2014.[4]

---

[4] Scott Kirsner, *DraftKings Puts "Pedal Down" to Become One of Boston's Hottest Startups*, beta Boston (June 5, 2015), http://www.betaboston.com/news/2015/06/05/ draftkings-puts-pedal-down-to-become-one-of-bostons-hottest-startups/.

13.     Defendant FanDuel is a Delaware corporation with its principal place of business in New York, New York.  FanDuel describes itself as "the leader in one-day fantasy sports." FanDuel made over $57 million in revenues in 2014.[5]

## FACTUAL ALLEGATIONS

14.     Daily fantasy sports contests evolved from informal fantasy sports games that have been around for several decades.  Earlier incarnations of these games involved groups of fans playing games against one another for fun over a full season.  Fantasy sports players would assemble hypothetical teams in "drafts," then compete against each other based on the number of points that their teams collected during actual games.

15.     These fantasy sports games exploded on the Internet in the 1990s, with players gaining ever greater access to statistics and data.  Daily fantasy sports games arose from this Internet explosion, with competitions conducted over a much shorter period of time—a single day or single weekend—than the season-long competitions.  FanDuel was launched in 2009; DraftKings launched three years later in 2012.  Industry studies estimate that daily games will generate around $2.6 billion in entry fees in 2015 and grow to as much as $14.4 billion by 2020.

16.     Defendants are companies that maintain daily fantasy sports websites that permit individuals to play one-day fantasy sports competitions against other players on the same website.  Fans pay an entry fee to a website—from as little as $0.25 up to $1,000—with prize pools that can pay as much as $2 million to the winner.  In order to participate in the daily fantasy sports contests, players on the websites are required to create an account, place money in it, and then use that money to pay entry fees into each game.  At the end of each day, winners of

---

[5] Ben Fischer, *FanDuel Quadruples Revenue, Draws 1 Million Users in Football Season*, NY Bus. J. (Updated Jan. 13, 2015, 11:22 a.m. ET), http://www.bizjournals.com/newyork/blog/techflash/2015/01/fanduel-triples-revenue-draws-1-million-users-in.html.

each fantasy sports contest are awarded prize money, which is credited to the individual player's account.

17.     Defendants take a percentage of the total pot in each daily fantasy sports contest as a fee for hosting the game.

18.     Defendants advertise and market themselves as games of skill and strategy and, therefore, avoid gambling industry regulations, including the Unlawful Internet Gambling Enforcement Act.  In fact, Defendants have spent over $200 million on advertising to reinforce that daily fantasy sports are skill-based games in order to build billion dollar companies.[6]  The millions of dollars went to ensure consumers were misled and ultimately defrauded by Defendants.

19.     For instance, a recent DraftKings advertisement encouraged players to "use your knowledge and showcase your skills."[7] Similarly, FanDuel runs advertisements that urge players to "get paid for [your] knowledge" if you are "smarter than the average fan."[8]

20.     Real world statistics show, however, that the vast majority of winnings in these daily fantasy sports games go to a very small percentage of players, with as few as 1% of the players taking home over 90% of the prize money.[9]

---

[6] Tom Kludt, *DraftKings and FanDuel Ads Seems to Be Everywhere on TV Because They Are*, CNNMoney (NY) (Oct. 8, 2015, 5:23 p.m. ET),
http://money.cnn.com/2015/10/08/media/fanduel-draftkings-commercials/index.html.
[7] DraftKings TV, *DraftKings - "Week 1"*, *available at* https://www.youtube.com/watch?v=VDa-acDu8KYg (last visited Oct. 19, 2015).

[8] *FanDuel Fantasy Football One-Week Leagues TV Commercial, "Get Paid for Knowledge"*, *available at* http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge (last visited Oct. 19, 2015).

[9] Ed Miller and Daniel Singer, *For Daily Fantasy Sports Operators, the Curse of Too Much Skill*, SportsBusiness Daily J. (July 27, 2015),
http://www.sportsbusinessdaily.com/Journal/Issues

21.     Similarly, Defendants engage in false and misleading advertisements concerning allotting bonuses to consumers.  Defendants offer to new players a "match" of money that is marketed as a bonus.  These bonuses, however, are not immediately available and come with numerous conditions and terms that are not disclosed until after the consumer has paid the initial deposit.  Instead, a consumer will be barred from accessing the bonus as it appears in their account.

## **THE TRUTH IS REVEALED**

22.     Access to data relating to any particular player, and analytics related to particular strategies that could increase a player's chances of winning, are of significant value to anyone competing in a particular competition.  Employees of each of the Defendants are at a particular advantage in this regard, given their access to the inside information, including statistics and analysis on how each competition has unfolded.

23.     It was recently reported that DraftKings' employees have won at least $6 million playing fantasy sports games on FanDuel. [10]  Similarly, FanDuel profiled one of its employees who won $50,000 playing fantasy sports games on other websites.

24.     An employee at DraftKings admitted recently to inadvertently releasing data before the start of the third week of National Football League games.[11]  The employee, a mid-

---

/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports; *see also* Joshua Brustein, *You Aren't Good Enough to Win Money Playing Daily Fantasy Football*, Bloomberg Businessweek (Sept, 10, 2015, 5:00 a.m. PT), http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football.

[10] Cork Gaines, *DraftKings Employees Reportedly Won Nearly $6 Million Playing Daily Fantasy Sports at Rival FanDuel*, Bus. Insider (Oct. 6, 2015, 3:06 p.m.) http://www.businessinsider .com/draftkings-daily-fantasy-sports-fanduel-2015-10.

[11] NFL Forum, *DraftKings Ownership Leak*, RotoGrinders, *available at* https:// rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (last visited Oct. 19, 2015).

level content manager named Ethan Haskell, won $350,000 at a rival site, FanDuel, that same week.

25.     Mr. Haskell's success playing Major League Baseball fantasy games on FanDuel in August of 2015, shows that the vast majority of his winnings began after he started to work—and had access to insider information—at DraftKings.[12]

26.     FanDuel employee Matt Boccio is ranked by RotoGrinders as one of the top fifty fantasy sports players while playing on only one website.   Mr. Boccio acquired this ranking while playing from June 16, 2015 to October 3, 2015, a period of less than four months.

27.     DraftKings founder Paul Liberman admitted that his employees were playing on rival sites in a September 25, 2015 speech, at a Babson College conference.   "We have some people who make significantly more money off of our competitors' sites than they do working for DraftKings," Mr. Lieberman told the group.[13]

28.     DraftKings' Chief Executive Officer, Jason Robins, previously acknowledged that he had "reservations" about allowing employees to participate in competitors' fantasy sports games.   Nonetheless, he and his counterparts at FanDuel conspired to allow their employees to continue the practice.   Mr. Robins stated, "I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."

---

[12]   Larry Brown, *Ethan Haskell: DraftKings Employee Won $350,000 on FanDuel*, *Larry Brown Sports* (Oct. 5, 2015), http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741.

[13] Callum Borchers, *DraftKings, FanDuel Team Up to Defend Integrity of Games*, Boston Globe (Oct. 6, 2015) https://www.bostonglobe.com/business/ 2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR 9C55R8hwL/story.html.

29.     He and his co-founders, Matt Kalish and Paul Liberman now admit that DraftKings employees' participation in fantasy sports games is improper and informs its customers, including Plaintiff, that it has enacted policies "prohibiting DraftKings employees from ... participation in any public daily fantasy sports contests for money" and "employees from any other Daily Fantasy Sports contest operator from participating in games on DraftKings."

30.     FanDuel similarly announced on its website, "We have permanently banned our employees from playing any daily fantasy games for money, on any site.  We will also require all customers to confirm that they are not an employee of any other third party fantasy site, and if they are, they will not be allowed to access our site."

31.     However, Defendants had concealed the extent to which its employees were successfully utilizing insider information to advance their competitive status.  Had Plaintiff and the Class known the extent to which games they had entered were populated by Defendants' employees with access to relevant, proprietary information, they would not have entered contests on Defendants' websites.   Plaintiff and the Class were injured by Defendants' course of fraudulent, misleading, and negligent conduct.

## PLAINTIFF'S FANTASY SPORTS PLAY

32.     Plaintiff participated in the online fantasy sports games available on DraftKings.  Plaintiff deposited an initial sum of money that DraftKings represented would be matched as a bonus.  Plaintiff was unable to ever access the "bonus" awarded by DraftKings.

33.     Plaintiff relied on Defendants' representations that its fantasy sports games are "games of skill."   Plaintiff had no knowledge that Defendants' employees used nonpublic information to participate in competitors' fantasy sports games with a competitive advantage.  Had Plaintiff known that he was participating in these games at a disadvantage to Defendants'

employees, he would not have paid entry fees to Defendants or participated in Defendants' fantasy sports games.

## UNCONSCIONABLE TERMS OF USE

### *DraftKings*

34.     Plaintiff and Class members are presented with DraftKings' Terms of Use via a hyperlink during the registration process.  No customer can complete the registration process without checking a box indicating agreement to the DraftKings Terms of Use.  Plaintiff and Class members were given no opportunity to negotiate the DraftKings Terms of Use.  According to DraftKings' Terms of Use, its customers are forced to either accept the Terms of Use in their entirety or reject them and forego using DraftKings' website:

> You agree to these Terms of Use by accessing or using the Website, registering for Services offered on the Website, or by accepting, uploading, submitting or downloading any information or content from or to the Website. IF YOU DO NOT AGREE TO BE BOUND BY ALL OF THESE TERMS OF USE, DO NOT USE THE WEBSITE.

35.     As demonstrated below, Plaintiff and Class members could not have procured equivalent services from competitors without being required to agree to similarly restrictive terms of use.

36.     DraftKings has the unilateral ability to modify its Terms of Use, which provide that "DraftKings reserves the right to amend these Terms of Use at any time and without notice, and it is your responsibility to review these Terms of Use for any changes.  If you continue to use the Services after we change the Terms of Use, you accept all changes."  Plaintiff and the Class members are not empowered to accept or reject any changes to DraftKings' Terms of Use.

37.     The Terms of Use also states: "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever."  It further "reserve[s] the right to cancel Contests at any time."  In

addition, "DraftKings may, without prior notice, immediately revoke any or all of your rights granted hereunder."  Such a revocation results in users losing all access to the DraftKings website.

38.     DraftKings' Terms of Use creates a contract of adhesion and does not constitute a valid, mutual agreement.  The Terms of Use employed by DraftKings, including the arbitration, class-action waiver, and forum selection clauses,[14] are illusory, oppressive, unconscionable, and unenforceable.

### *FanDuel*

39.     Plaintiff and Class members are presented with FanDuel's Terms of Use via a hyperlink during the registration process.  Customers are not given the option of rejecting or accepting the Terms of Use.  Plaintiff and Class members were given no opportunity to negotiate FanDuel's Terms of Use.  They were forced to either accept the Terms of Use in their entirety or else reject them and forego using FanDuel's website.  Plaintiff and Class members could not have procured equivalent services from competitors without being required to agree to similarly restrictive terms of use.

40.     The Terms of Use of  FanDuel states that it:

> [R]eserves the right, at its sole discretion, to modify or replace the Terms of Use at any time.  The most current version of these Terms will be posted on our Site. You shall be responsible for reviewing and becoming familiar with any such modifications.  If a revision to the Terms, in our sole discretion, is material, we will notify you by contacting you through the email address associated with your

---

[14] A review of prior versions of the DraftKings website indicate that the arbitration and class-action waiver clauses were added in September 2014.  *Compare* 9/15/14 Terms of Use, *available at* http://web.archive.org/web/20140915130255/https://www.draftkings.com/help/terms (last visited Oct. 9, 2015), *with* 7/6/14 Terms of Use, *available at* http://web.archive.org/web/20140706001849/https://www.draftkings.com/help/terms (last visited Oct. 9, 2015).

account.   Use of the Services by you after any modification to the Terms constitutes your acceptance of the Terms of Use as modified.

Plaintiff and the Class members are not empowered to accept or reject any changes to FanDuel's Terms of Use.

41.     FanDuel's Terms of Use also states that it "reserves that right to cancel contests, in our sole discretion, without any restrictions."  The Terms of Use further provide that "FanDuel may remove any User Content and terminate any FanDuel account at any time for any reason."

42.     FanDuel's Terms of Use creates a contract of adhesion and does not constitute a valid, mutual agreement.  The Terms of Use employed by FanDuel, including the arbitration, class-action waiver, and forum selection clauses added by FanDuel in 2013, [15] are illusory, oppressive, unconscionable, and unenforceable.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3).

44.     Plaintiff seeks certification of the following nationwide class (the "Nationwide Class"):

> All persons in the United States who deposited money into a DraftKings and/or FanDuel account on or before October 6, 2015, and competed in any daily fantasy sports contest where other entries were made by employees from DraftKings, FanDuel, or any other daily fantasy sports site.

45.     In the addition, Plaintiff seeks certification of the following subclass (the "Massachusetts Class") (collectively with the Nationwide Class, the "Class"):

---

[15] *Compare* 11/29/13 Terms of Use, *available at* http://web.archive.org/web/20131129161640/https: //www.fanduel.com/terms (last visited Oct. 9, 2015), *with* 8/14/13 Terms of Use, *available at* http://web.archive.org/web/20130814150029/https://www.fanduel.com/terms (last visited Oct. 9, 2015).

All persons in the state of Massachusetts who deposited money into a DraftKings and/or FanDuel account on or before October 6, 2015, and competed in any daily fantasy sports contest where other entries were made by employees from DraftKings, FanDuel, or any other daily fantasy sports site.

46.     Excluded from the Class are the Defendants, their parent companies, subsidiaries, and affiliates; any co-conspirators; federal governmental entities and instrumentalities of the federal government; states and their subdivisions, agencies, and instrumentalities; and any judicial officer presiding over this matter and his or her staff.

47.     **Numerosity.**  The Class comprises thousands or more of consumers throughout New York.  The Class is so numerous that joinder of all members is impracticable.

48.     **Commonality and Predominance.**  Common questions of law and fact exist as to Plaintiff and the Class and predominate over any questions that affect only individual Class members.  These common questions of law and fact include, without limitation:

(a)     the nature, scope, and operations of the wrongful practices of Defendants;

(b)     whether Defendants engaged in a course of unfair, unlawful, fraudulent, and/or deceptive conduct in the daily fantasy sports contests made available on their respective websites;

(c)     whether Defendants knew or should have known their business practices were unfair and fraudulent, as described in this Complaint, in the daily fantasy sports contests made available on their respective websites;

(d)     whether Massachusetts law governs the Nationwide Class claims;

(e)     whether Defendants owed a duty of care to Plaintiff and the Class;

(f)     whether Defendants made fraudulent and/or misleading representations in connection with offering bonuses to consumers;

(g)     whether Defendants knew or should have known that their representations were fraudulent and/or misleading in connection with offering bonuses to consumers;

(h)     whether Defendants' fraudulent and deceptive conduct harmed Plaintiff and the Class; and

(i)     whether Defendants were unjustly enriched by their deceptive practices.

49.     **Typicality.**  Plaintiff's claims are typical of the claims of Class members. Plaintiff and the Class sustained damages arising out of Defendants' common course of conduct in violation of law, as described herein. The damages of each Class member were caused directly by Defendants' unlawful and deceptive conduct.

50.     **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the Class because they share common injuries as a result of Defendants' conduct that is common to all Class members. Plaintiff has no interests adverse to the interests of absent Class members. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex class action and consumer protection litigation. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class, and have the financial resources to do so.

51.     **Superiority.**  A class action is superior to other methods of fairly and efficiently adjudicating this litigation. While not inconsequential, the damages as to any individual litigant are such that individual litigation is not feasible. Furthermore, many Class members may not even be aware that they have claims. Accordingly, for Class members, a class action is the only mechanism by which they could reasonably expect to vindicate their rights.

52.     The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action.

53.     Class treatment of predominating common questions of law and fact is superior to multiple individual actions because it would conserve the resources of the Court and the litigants, and further the efficient adjudication of Class members' claims.

54.     Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I
### (Fraud)

55.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

56.     As is fully alleged above, throughout the class period, Defendants made misrepresentations and material omissions of fact which were false and which Defendants knew to be false.  Specifically, Defendants misrepresented that their fantasy sports contests were fair games of skill.  Defendants willfully failed to disclose that their employees, agents, and with access to nonpublic statistics and other information could use this information, which gives them a significant competitive advantage, to participate in fantasy sports games on competitors' websites and compete against Plaintiff and the Class members.

57.     Defendants had superior knowledge regarding their employees' access to statistical information and their employees' ability to use that information to gain a competitive advantage in competitors' fantasy sports games.  The knowledge that Defendants' employees were using nonpublic information to gain a competitive advantage in fantasy sports games was not readily available to Plaintiff and the Class members.  Failing to disclose this information to Plaintiff and the Class members rendered Defendants' transactions with Plaintiff and the Class members inherently unfair.  Defendants therefore had a duty to disclose this information to Plaintiff and the Class members.

58.     Defendants' misrepresentations and omissions created the illusion that their games were fair games of skill.  Defendants' misrepresentations and omissions were made for the purpose of inducing Plaintiff and members of Class to join their websites and pay entry fees to Defendants to participate in their fantasy sports games.

59.     Plaintiff and the Class members justifiably relied on Defendants' misrepresentations and omissions when they joined Defendants' websites, payed Defendants' entry fees, and participated in Defendants' fantasy sports games.  Defendants knew, or should have known, that the integrity of the fantasy sports games was a material fact inducing Plaintiff and the Class members to pay entry fees and participate.  Plaintiff and the Class members would not have payed entry fees and participated in Defendants' fantasy sports games absent Defendants' misrepresentations and omissions regarding the same.

60.     As a result of Defendants' fraudulent misrepresentations and omissions, Plaintiff and the Class members were induced into transactions that they otherwise would not have made and suffered financial injury, harm, and damages as described in this Complaint.

### COUNT II
### (Negligent Misrepresentation)

61.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

62.     Plaintiff brings this claim on behalf of himself and the proposed Class.

63.     Defendants had a duty to disclose to Plaintiff and the Class members that their employees had access to internal information not available to the general public and that  the statements that "winners are determined by the individuals who use their skill and knowledge of relevant professional sports information and fantasy sports rules to accumulate the most fantasy

points" was misleading. Likewise, Defendants had a duty to disclose the true nature of the bonus awarded to new subscribers.

64.     Defendants negligently and/or carelessly misrepresented, omitted, and concealed from consumers material facts relating to online fantasy sports offered by Defendants.

65.     These misrepresentations and omissions were material and concerned the specific information that a reasonable consumer would consider in choosing to participate in the online fantasy sports offered by Defendants.

66.     As a result of Defendants' misstatements and omissions, they were under a duty to disclose the additional facts necessary to avoid any misrepresentation or confusion. Further, Defendants knew of their misrepresentations and omissions.

67.     At the time, Defendants failed to disclose, conceal, suppress, and/or omitted material information they knew, or by the exercise of reasonable care should have known, that the statements were false and misleading to reasonable consumers.

68.     Plaintiff and Class members justifiably relied upon Defendants' misrepresentations and omissions. Plaintiff and Class members were unaware of the falsity of Defendants' misrepresentations and omissions and, as a result, justifiably relied on them in participating in the online fantasy sports offered by Defendants. Had Plaintiff and Class members been aware of the truth, they would not have participated in Defendants' programs.

69.     As a direct and proximate result of Defendants' misrepresentations and omissions of material fact, Plaintiff and Class members have suffered and will continue to suffer damages and losses as alleged herein in an amount to be determined at trial.

## COUNT III
### (Negligence)

70.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

71.     Defendants promise in their Terms of Use that their fantasy sports games are "games of skill" and accepted entry fees from Plaintiff and Class members to participate in those games.  According to those same Terms of Use, "winners are determined by the individuals who use their skill and knowledge of relevant professional sports information and fantasy sports rules to accumulate the most fantasy points."

72.     Defendants owed a duty to Plaintiff and the Class members to use reasonable care to provide true, reliable, and accurate information regarding the administration of their fantasy sports games.  Defendants also owe a duty to protect the fairness and integrity of the fantasy sports games being operated on their websites.

73.     Defendants breached these duties to Plaintiff and the Class members by failing to prevent persons possessing nonpublic information, by virtue of their employment by other fantasy sports websites, from competing against Plaintiff and the Class members.  Defendants further breached these duties by allowing their employees to participate in fantasy sports games on competitors' websites.  Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data, and ability of employees to use material nonpublic data to compete against Plaintiff and the Class members on other websites, or allow employees of other companies with material nonpublic access to compete on the websites where Plaintiff and the Class members competed.

74.     As a direct and proximate result of Defendants' negligence, Defendants' significantly and materially decreased Plaintiff and the Class members' ability to use their skills

to win the fantasy sports games they entered, and Plaintiff and the Class members suffered financial injury, harm, and damages.

## COUNT IV
### (Unjust Enrichment)

75.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

76.     Defendants have benefited and been enriched from their unlawful acts by accepting the benefit conferred by Plaintiff and the Class members.

77.     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the entry fees paid by Plaintiff and the Class members to participate in Defendants' fantasy sports games.

78.     Defendants' ill-gotten gains were at the expense of Plaintiff and the Class members through their payment of entry fees to participate in Defendants' fantasy sports games.

79.     It is against equity and good conscience to permit Defendants to retain their ill-gotten profits.

**WHEREFORE**, Plaintiff, individually and on behalf of all other similarly situated, prays for relief and judgment as follows:

A.     For an order certifying this case as a class action and appointing Plaintiff and Plaintiff's counsel to represent the Class;

B.     For a declaratory judgment and injunction prohibiting the use of nonpublic information while participating in fantasy sports games on Defendants' websites;

C.     For an order awarding, as appropriate, damages, restitution, and/or disgorgement to Plaintiff and the Class members, including all damages to which Plaintiff and the Class are entitled to under Massachusetts law, and all other statutory penalties.

D.      For an order awarding attorneys' fees and costs to Plaintiff and the Class;

E.      For an order awarding punitive damages;

F.      For an order awarding pre-judgment and post-judgment interest; and

G.      For an order providing such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted,

DANIEL HOLLAND, Individually and on behalf of All Others Similarly Situated,

By his attorneys,

/s/ Christopher Weld, Jr.
Christopher Weld, Jr. (BBO#522230)
Corrina L. Hale (BBO#670916)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
cweld@toddweld.com
chale@toddweld.com


*And Pro Hac Vice (Application to be filed):*

Brian J. Robbins
Kevin A. Seely
Ashley R. Rifkin
Leonid Kandinov
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com
arifkin@robbinsarroyo.com
lkandinov@robbinsarroyo.com

Robert K. Shelquist
Rebecca A. Peterson
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com

Charles J. LaDuca
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Telephone: (240) 483-4292
Facsimile: (202) 789-1813
charles@cuneolaw.com

*Attorneys for Plaintiff*

Dated: October 26, 2015